

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-17-00368-CV

IN THE INTEREST OF D.D.,
A CHILD

----------

FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY
TRIAL COURT NO. CIV-16-0707

----------

## MEMORANDUM OPINION[1]

----------

After a jury trial, the trial court terminated the parent-child relationships between Appellants D.D. (Father) and D.I. (Mother) and their son D.D. in accordance with the jury's broad-form verdict, finding by clear and convincing evidence that termination was in D.D.'s best interest and that both parents had:

---

[1]*See* Tex. R. App. P. 47.4.

- knowingly placed or knowingly allowed [D.D.] to remain in conditions or surroundings which endanger[ed his] physical or emotional well-being;

- engaged in conduct or knowingly placed [D.D.] with persons who engaged in conduct which endanger[ed his] physical or emotional well-being; [and]

- failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of [D.D.,] who ha[d] been in the . . . temporary managing conservatorship of the Department of Family and Protective Services [(TDFPS)] for not less than nine months as a result of [his] removal from the parent . . . for . . . abuse or neglect.

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2) (West Supp. 2017). The trial court also found that Father had:

- knowingly engaged in criminal conduct that . . . resulted in [his] conviction of an offense[] and []confinement or imprisonment and inability to care for [D.D.] for not less than two years from the date of filing the petition; [and]

- constructively abandoned [D.D.,] who ha[d] been in the . . . temporary managing conservatorship of [TDFPS] for not less than six months, and:

  i.    [TDFPS] ha[d] made reasonable efforts to return [D.D.] to [Father];

  ii.   [Father] ha[d] not regularly visited or maintained significant contact with [D.D.]; and

  iii.  [Father] ha[d] demonstrated an inability to provide [D.D.] with a safe environment.

Id. § 161.001(b)(1)(N), (Q).

In five issues, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment and noncompliance findings against her (issues 1, 2, and 3), the factual sufficiency of the evidence supporting

the trial court's best-interest finding against her (issue 5), and the admission of a police body-camera video (issue 4). In six issues, Father challenges the factual sufficiency of the evidence supporting all the trial court's findings against him except the finding that he engaged in conduct which endangered D.D.'s physical or emotional well-being. Because we hold that the evidence is sufficient to support the termination of Father's and Mother's parental rights and that the trial court did not reversibly err by admitting the video, we affirm the trial court's judgment.

## I. BACKGROUND FACTS

### A. Father Went to Prison Before D.D. Was Born and Lived with Mother and D.D. After His Release.

In October 2012, Mother met Father at a nightclub, and she got pregnant not long after and, as she testified, before she "even kn[e]w him." Mother testified that she and Father lived apart and "were never a couple" during the pregnancy. D.D. was born in November 2013, the day after Father's community supervision was revoked and his prison sentence began. However, Mother did not ask Father why he was on community supervision or why it was ultimately revoked until later. She testified:

> I wasn't sure if he was the father. So I didn't care to ask about his history. I didn't care to know why he was on probation.
>
> . . . .
>
> . . . . It's not like I meet someone and ask oh, what is on your record. Do you have any drugs on your record[?]
>
> . . . .

3

. . . . I don't meet someone and ask them within the first month, do you have CPS history. Do you have a background history[?]

She found out later that Father's offense was drug-related.

Father testified that he was first arrested when he was twenty-three or twenty-four years old for possession of cocaine in a drug-free zone, a felony, and possession of marihuana. He was placed on community supervision, and after six years, roughly the period of 2007 to 2013, his community supervision was revoked, he was sentenced to four years' confinement, and he served twenty-three months that corresponded to D.D.'s first twenty-three months of life.

Mother raised D.D. on her own in Abilene, Texas, while Father was in prison, but she exchanged letters with Father and "really started to like him." After Father's release from prison in October 2015, Mother welcomed him into her home and tried to build a family. She testified that she had "started to believe" that Father was D.D.'s biological father because D.D. looked like Father and his other children.

## B. Father Sold Drugs out of the Home, Mother Told Him to Leave, and Violence Ensued.

Mother testified:

- Drugs "c[ame] back in the picture" in December 2015 or January 2016;

- She did not know if Father was selling drugs yet in December 2015, but he was using them then;

- She repeatedly asked Father not to have drugs at their house and not to bring them around D.D. and her;

4

- In February 2016, about a month and a half after she realized that Father was using drugs, she began "seeing the drugs and everything" in her home;

- She then began telling Father to move out;

- He continued to use and sell drugs, keeping them in the home and bringing them around D.D.;

- The violence between Father and Mother began, but it never occurred in D.D.'s presence; and

- In March 2016, she began calling the police whenever Father came to the house and was violent, but they did not do anything to help her.

Father's testimony corroborated Mother's in some ways and conflicted with it in others. He testified:

- He first tried methamphetamine with Mother, probably in January 2016;

- Mother had told him when he was in prison that she had already used methamphetamine;

- Mother told him that "she struggled with [him] bringing [methamphetamine] in[to] the house because she had . . . already been exposed to [it]";

- His bringing methamphetamine into the house caused Mother, who had quit, to begin using it again;

- While Father kept drugs in the house, he kept them out of D.D.'s reach;

- Mother was short-tempered after Father got out of prison;

- She would "spaz out," "had outbursts of rage," and was "a compulsive liar";

- Later, Mother told Father that she was already "doing drugs" when he noticed her personality changes, but he did not know that at the time;

5

- He "was just truly disrespectful to her," he hit her, and she would become enraged and hit him multiple times;

- Mother would usually take D.D. to the home of her mother (Grandmother) if the couple got "into it like that";

- Mother "knew that the only way to get to [Father] was through [D.D., a]nd she did that a lot";

- Once Mother twisted D.D.'s arm to just to hurt Father;

- Another time she put D.D. out of her car on the side of the road along with Father;

- On one occasion on a busy street in Abilene, Mother, using racial slurs, verbally encouraged D.D. to run away from Father's side and to her;

- Father called the police about Mother's treatment of D.D. "multiple times"; and

- The various incidents of domestic violence Mother engaged in regarding D.D. happened in the period of January through March 2016.

Father also testified that he lived with D.D. only from October 2015 to January 2016 and that he did not deal drugs when he lived with D.D. but only began dealing drugs after "this case started." We note that the investigation in this matter began in mid-July 2016, and TDFPS filed its petition on August 1, 2016.

Mother denied all of Father's claims regarding her alleged mistreatment of D.D.

**C. Mother Took D.D. to Her Parents' Home in Weatherford and Began Packing to Move from Abilene to Weatherford; the Violence and Emotional Abuse Escalated.**

Mother testified:

6

- In April 2016, she reached out to an Abilene women's shelter but was denied aid in May 2016 because she made too much money;

- Also in April 2016, her Abilene relatives beat Father up for abusing her;

- By July 2016, Mother had lost her job, had not paid rent for the last two months of her lease, and was in eviction proceedings;

- Mother felt that moving in with her parents (Grandparents; Grandmother and Grandfather individually) in Weatherford was her only alternative;

- She took D.D. to Grandparents' house in Weatherford around July 4, 2016;

- Her brother C.I. "trie[d] to hit her" while she was at Grandparents' house because he thought she had stolen something from him;

- She called the police and left, taking D.D. with her because C.I. was still at Grandparents' house;

- Her car broke down;

- She called Father, but he did not offer any help;

- Grandfather went to bring Mother and D.D. back to Weatherford; C.I. and his girlfriend were no longer at Grandparents' house;

- Mother went back to Abilene to finish packing, leaving D.D. with Grandparents in Weatherford;

- "[T]hings [be]came really violent" between her and Father then; and

- "More things were being told to [her]" that left her feeling "worthless," "hopeless," and like "nobody cared" or "would miss [her]."

Father testified,

- Mother's family attacked him at a softball game "[b]ecause she was going around with black eyes";

- D.D. was present at the fight but one of the relatives held him "so far back";

7

- Father did not believe Mother when she called to tell him she had had trouble with the car and that she and D.D. were stranded, so he did nothing; and

- Father lived with Mother off and on until she got evicted.

## D. Mother Attempted Suicide, and TDFPS Removed Two-Year-Old D.D.

On July 13 and again on July 14, 2016, while still in her home in Abilene, Mother attempted to commit suicide by first snorting methamphetamine and taking a combination of hydrocodone, Xanax, and other prescription pills, and later, when she woke up the next morning, by taking Tylenol PM. Mother testified that she had never used methamphetamine before and that she obtained it "[o]ff the street," refusing to name names. Father testified that she admitted that she had stolen methamphetamine out of his stash before.

Mother testified that she had both called and texted Father after waking up from the first suicide attempt but before taking the Tylenol PM and told him that she had tried to commit suicide. He did not believe her. She denied at trial that he encouraged her to try to kill herself. Father testified that because he did not believe her threat, he did not notify anyone of her intention.

After her suicide attempt, Mother was admitted to a local Abilene hospital. The hospital found out she had a child, and Taylor County TDFPS was called. Mother told the Taylor County TDFPS investigator, Ninfa Chavira:

- D.D. was in Parker County with Grandparents;

- Father was staying with his mother;

8

- Mother had stolen the pills she had taken in her suicide attempt from Father, who was a drug dealer;

- Mother had never used methamphetamine before;

- Father had encouraged her to kill herself and told her no one would care;

- Grandfather had just been released from prison for drug-related offenses;

- Grandmother had been in prison in the past for drug-related offenses; and

- Mother's brother C.I. also had a drug problem.

When Father and Chivara spoke after Mother's attempted suicide, Father told Chavira that he had seen Mother twist D.D.'s arm just to hear him scream about a month earlier but did not report it. When speaking with Chavira, Father:

- Denied domestic violence;

- Admitted to smoking marihuana; and

- Neither confirmed nor denied that he encouraged or had prior knowledge of Mother's suicide attempts.

Mother returned to Grandparents' home after her release from the hospital, and the TDFPS case was transferred from Taylor County to Parker County. Parker County TDFPS completed criminal and CPS background checks on everyone living at Grandparents' home and decided to remove D.D. based on Mother's suicide attempts and the various criminal histories of the other inhabitants, including Grandmother's recent arrest and charges for throwing a hatchet at Grandfather. Mother declined to try to place D.D. with family at that point because the family members she believed would qualify lived in Abilene;

9

she planned to remain with Grandparents in Parker County and wanted to visit D.D. regularly. TDFPS therefore placed D.D. with a foster family.

## E. Mother Completed Most of Her Court-Ordered Services and Regained Possession of D.D. on a Monitored Return in February 2017.

Mother realized she needed help even before the removal. She began working services even before TDFPS prepared her specific service plan, and Mother worked hard, passed drug tests, and completed most of her services. Around Halloween in 2016, she asked TDFPS to slow down the reunification process between D.D. and her "[b]ecause [she] didn't feel like [she] was all the way on [her] feet yet. [She] felt like [she] still needed help." Mother testified that she did not feel ready for the return until TDFPS personnel told her that they felt she was ready. She regained possession of D.D. on a monitored return in February 2017, about six months after the removal.

## F. Meanwhile, Father Did Not Begin Services, His Paternity Was Formally Established, and He Had Only One Visit with D.D.

Even though Father believed that D.D. was his son, Father was not listed as the father on D.D.'s birth certificate. After Parker County TDFPS conservatorship worker Samantha Perez (Caseworker Perez) was assigned to the case in August 2016, Mother made statements indicating that Father might not be D.D.'s biological father. DNA tests were therefore conducted. Father was upset at Mother for questioning his paternity, and Caseworker Perez testified that he told her that he would not engage in services until his paternity was proven and that he also refused to submit to a drug test. TDFPS then suspended his

10

visits with D.D.  At that point, Father had had only one visit.  He requested and was granted two other visits after his paternity was established but cancelled them.

At trial, Father denied telling Caseworker Perez that he did not want to follow the service plan or submit to drug tests until the paternity results came in but admitted that he refused TDFPS's first request that he take a drug test.  He claimed that he met with Perez and the TDFPS trial attorney and that they told him he could not get a lawyer and did not "need to do the service plan . . . until [he] was presumed as the father."

The DNA results confirming Father's paternity arrived in October or early November 2016, and Caseworker Perez texted Father the results on the same day that she received them and also offered to set up a visit with D.D.  Father did not respond.  Caseworker Perez found out that Father was in jail in November 2016, so she wrote him a letter asking him to contact her.  He attended a permanency hearing on February 1, 2017, but at that point, TDFPS returned D.D. to Mother on the monitored return.

Father testified:

- He talked to Caseworker Perez in Weatherford "plenty of times" but later clarified that after his paternity was established and he was arrested in November 2016, the contact "really stopped";

- The November 2016 arrest was for manufacturing and delivering a controlled substance, which he agreed at trial was either making or selling drugs, and a friend bonded him out two days later;

11

- Caseworker Perez told Father in November 2016 that a courtesy caseworker in Abilene would contact him.

**G.     In April 2017, D.D. Was Removed Again in Abilene After Mother Was Found Intoxicated and Tested Positive for Methamphetamine and Cocaine.**

Sixty-six days following his monitored return to Mother, TDFPS removed D.D. after Abilene police discovered Mother at approximately 4:30 a.m. on April 8, 2017, in a known drug area in Abilene with a man, a stolen vehicle, and crack cocaine. The man was arrested for stealing the vehicle and possessing crack cocaine. Mother was not arrested, but because she was admittedly intoxicated and told the police about her TDFPS case and that she had left D.D. in a home nearby, the Abilene police called their local Taylor County TDFPS office. The police recognized that the home where Mother left D.D. was known as a place where crack cocaine was bought and sold, but Mother testified that she was unaware of its reputation and that she had never known her friend who lived there to "have or sell drugs or do drugs." She admitted that she "never asked" and did not "know about people's history."

The Taylor County TDFPS agents met Mother and the police at the Abilene house where she had left D.D. He was asleep on the couch. Mother tested positive for methamphetamine and cocaine via an oral swab test; she testified that the first two oral swabs were inconclusive but that she tested positive on the third one. Mother insisted at trial that she had not taken drugs before the oral swab test, but she admitted that she was drunk when the police

12

found her. After his emergency removal, Parker County TDFPS placed D.D. in a different foster home but with someone he already knew because the second foster mother (Foster Mom) was a friend of the first foster family and had provided respite care for D.D. on occasions when his first foster family went out of town.

## H. Mother Quit MHMR Therapy and, Less Than Three Weeks Before Trial, Tested Positive for Drugs Again.

Although Mother was again subject to a court-ordered service plan after D.D.'s second removal, she did not make much headway on her services. She was unsuccessfully discharged from her MHMR therapy after missing approximately six months' worth of appointments. She testified that she did not go to the appointments because she did not want to and did not think she needed them. She refused to take a drug test when Caseworker Perez asked her to in May 2017. She finally took a 90-day hair test on June 2, 2017, and tested negative, which provided some support for her claim that she had not used drugs before D.D.'s April 8, 2017 re-removal despite the positive oral swab test. We note, however, that while the June 2017 test included cocaine in the panel of substances tested, there is no evidence that the test also checked for the presence of methamphetamine. Finally, in mid-September 2017, less than three weeks before trial, Mother tested positive for amphetamines, methamphetamine, and marihuana. She admitted at trial that she had given up hope and had begun using methamphetamine, Adderall, and marihuana.

**I.** **Father Completed a Few Services, Agreed to a Plea Bargain in his Criminal Case, and Began Serving a Four-Year Sentence.**

According to Father, his Taylor County courtesy caseworker in Abilene, whom he met for the first time in May 2017, was supposed to give him his service plan and referrals, but Father was not able to get any referrals in Abilene or transportation from Abilene to Weatherford to complete his services there. Caseworker Perez testified that Father's May 2017 service plan was no different from his original September 2016 service plan that she had discussed with him because he did not complete any services before May 2017.

Regarding his service plan, Father testified that:

- He completed his MHMR assessment "within the first two, three months" in Abilene but mistakenly did not release it to TDFPS;

- He did not attend any counseling or receive any referrals for counseling;

- His courtesy caseworker approved his housing in May 2017;

- Father's employment was sporadic;

- He never signed a release for TDFPS but also never received a release form;

- He took every drug test that TDFPS requested except the first one, which was requested before his paternity was established;

- He did not have a psychological evaluation because "the lady at MHMR" told him he did not need it;

- He went to Narcotics Anonymous classes but did not attend substance abuse counseling during the case;

- He stayed in contact with his caseworker;

- Father engaged in criminal behavior;

14

- He did not realize that his plea bargain on the new drug case could affect his termination case;

- He did not attend and complete a Batterer's Intervention and Prevention Program;

- He did not attend the parenting classes TDFPS wanted him to attend; and

- He did not pay regular child support for D.D.

In July 2017, a new Parker County TDFPS conservatorship worker, Crystal Countryman (Caseworker Countryman), was assigned to the case because Caseworker Perez was on maternity leave. Father sent Caseworker Countryman one letter from Taylor County Jail before his ultimate transfer to Parker County Jail to participate in the termination trial. She considered visiting him in Parker County Jail but did not because of safety concerns. Father did not receive appointed counsel until August 18, 2017, less than two months before trial began.

## II. DISCUSSION

### A. The Evidence Sufficiently Supports the Termination of Mother's and Father's Parental Rights.

#### 1. TDFPS Has a Clear-and-Convincing Burden of Proof.

For a trial court to terminate a parent-child relationship, TDFPS must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b) (West Supp. 2017); *In re E.N.C.*, 384 S.W.3d 796, 802–03 (Tex.

2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

**2. We Determine Whether the Evidence Is Sufficient to Support Termination Findings.**

**a. To Determine Legal Sufficiency, We Review All the Evidence in the Light Most Favorable to the Finding.**

To determine whether the evidence is legally sufficient in termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We presume that the factfinder settled any conflicts in the evidence in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

16

**b. To Determine Factual Sufficiency, We Carefully Review All the Evidence, Giving Appropriate Deference to the Factfinder.**

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting termination. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and will not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the challenged finding is true. *See* Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

**3. The Evidence Is Factually Sufficient to Support the Endangering-Conduct Finding Against Father.**

In his third point, Father challenges the finding that he placed D.D. with someone who endangered him but does not challenge the disjunctive part of that finding that Father endangered D.D. with his own conduct. *See* Tex. Fam. Code Ann. § 161.001(b)(E). Along with a best-interest finding, a finding of only one ground alleged under section 161.001(b)(1) is sufficient to support a judgment of termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re A.H.*, No. 02-17-00222-CV, 2017 WL 5180785, at *13 (Tex. App.—Fort Worth Nov. 9, 2017, pet. denied); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.–Fort Worth 2007, no

17

pet.). In the interest of justice, we point out that the evidence that Father used and sold drugs around D.D., as well as the evidence of domestic violence between Father and Mother and of Father's repeated incarcerations in D.D.'s young life, is factually sufficient to support the endangering-conduct finding against Father. *See In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied); *In re C.W.*, No. 02-17-00025-CV, 2017 WL 2289115, at *4–7 (Tex. App.—Fort Worth May 25, 2017, no pet.) (mem. op.). We overrule Father's third issue, and we do not reach his second, fourth, fifth, or sixth issues. *See* Tex. R. App. 47.1; *A.V.*, 113 S.W.3d at 362; *In re D.N.*, 405 S.W.3d 863, 872 (Tex. App.—Amarillo 2013, no pet.).

### 4. The Evidence Is Legally and Factually Sufficient to Support the Noncompliance Finding Against Mother.

In her third issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's finding under subsection (O) that she "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of [D.D.]." Tex. Fam. Code Ann. § 161.001(b)(1)(O). The family service plan filed with the court May 26, 2017 and admitted into evidence without objection includes the following among Mother's required tasks and services:

MHMR:

[Mother] will actively participate in an MHMR assessment to determine if any mental health issues need to be addressed, and follow any recommendations made. [Mother] can contact Pecan Valley MHMR at 1715 Santa Fe Dr, Weatherford, TX 76086 or 817-

18

599-7634, to complete her assessment. [TDFPS] will monitor [Mother's] attendance and participation with services.

. . . .

Drug Testing:

[Mother] will remain drug and alcohol free throughout the case. [Mother] will submit to random drug testing including oral swabs, urinalysis, and hair follicle testing. [Mother] will report to the testing facility within 2 hours of being asked, and will provide photo ID at the testing site. Failure to comply within timeframe allotted by [TDFPS] will be a presumed positive result.

The September 13, 2017 permanency hearing order incorporating that plan and admitted into evidence without objection provides,

6.1. IT IS ORDERED that, except as specifically modified by this order or any subsequent order, the plan of service for the parents, filed with the Court is APPROVED and made an ORDER of the Court.

In her brief, Mother acknowledges that she was only "largely compliant" or "in substantial compliance" with the court-ordered services, and she admits that she "stopped attending follow-up sessions with MHMR for the final six months of the case." The evidence shows that Mother was unsuccessfully discharged from her MHMR therapy after she missed about six months of appointments. Mother testified that she stopped going to the appointments because she did not believe she needed them and did not want to go to them.

The evidence also shows that Mother did not comply with the drug testing requirement. She had some presumed positive results because she failed to submit to some tests in accordance with the family service plan requirement. She also failed the April 2017 oral swab outright. Finally, on September 14,

19

2017, the day after the trial court signed the last permanency plan order before the trial, Mother submitted hair that tested positive for amphetamines, methamphetamine, and marihuana, and her testimony confirmed that she had begun using those drugs. Mother raises no argument—and we do not conclude—that she proved by a preponderance of the evidence that she (1) was unable to comply with specific provisions of the court order, (2) made a good faith effort to comply with the order, and (3) was not at fault for failing to comply. *See* Tex. Fam. Code Ann. § 161.001(d) (West Supp. 2017); *In re A.A.*, No. 02-17-00307-CV, 2018 WL 771972, at *8 (Tex. App.—Fort Worth Feb. 8, 2018, no pet. h.) (mem. op.). Accordingly, applying the appropriate standard of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother failed to comply with a court order that specifically established the actions she needed to take for D.D. to be returned to her. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). We overrule her third issue, and, because a finding of only one ground alleged under section 161.001(b)(1) coupled with a best-interest finding supports termination, we do not reach her first two issues. *See* Tex. R. App. 47.1; *A.V.*, 113 S.W.3d at 362; *D.N.*, 405 S.W.3d at 872.

### 5. The Evidence Is Factually Sufficient to Support the Best-Interest Findings Against Both Parents.

Father challenges the factual sufficiency of the evidence supporting the best-interest finding against him in his first issue, and Mother challenges the factual sufficiency of the evidence supporting the best-interest finding against her

20

in her fifth issue.

### a. We May Consider the *Holley* Factors in Reviewing the Best-Interest Finding.

In reviewing the factfinder's determination of a child's best interest, we must employ a strong presumption that keeping a child with a parent serves the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b). We consider the evidence in light of nonexclusive factors that a factfinder may apply in determining a child's best interest:

(A) the [child's] desires . . . ;

(B) the [child's] emotional and physical needs . . . now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the [parent's] acts or omissions . . . indicat[ing] that the existing parent-child relationship is not a proper one; and

(I) any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### b. D.D. Had Bonded with His Foster Family.

D.D. was too young to express his desires regarding termination, but the evidence was undisputed that his bond with Mother was strong. As for Father, he was not part of D.D.'s life for about three years—D.D.'s first twenty-three months and the thirteen months before trial; most of that time, Father was confined in jail or prison. While Mother testified that Father was involved in D.D.'s life from October 2015 until May 2016 and Father testified, "[D.D.] knows me," Father saw D.D. only once after the initial removal in July 2016 and that visit occurred in August 2016, about thirteen months before the trial ended in early October 2017. We therefore cannot conclude that Father and D.D. had a strong bond.

The evidence showed that D.D. did have a strong bond with Foster Mom and her son. When D.D. was removed from his home for the second time, his first foster family could not take him because they were in the process of

adopting another child privately, so the first foster mother asked Foster Mom to consider taking him; and she did. D.D. had first met Foster Mom and her son when he was with his first foster family in the summer of 2016. The two foster families socialized together, the children went to school together, and Foster Mom provided respite care when D.D.'s first foster family went out of town. Foster Mom testified that when D.D. was in his first foster home, she usually saw him several times a week.

D.D. hugged Foster Mom when the TDFPS worker delivered him to her after the second removal. Foster Mom explained at trial, "[T]o him it . . . wasn't different because he knew who we were. He felt safe."

By the time of trial, D.D. had been with his foster family about six months, was bonded to his foster brother, who was just eight months older, and was bonded to Foster Mom and calling her "Mom." Foster Mom also reestablished D.D.'s contact with his first foster family because the two families had remained close.

### c. Neither Mother nor Father Was Ready for D.D.'s Return.

The evidence showed that D.D. had been diagnosed by his licensed professional counselor (LPC) with Post-Traumatic Stress Disorder (PTSD) and that he had a speech impediment. He also had an umbilical hernia. Foster Mom stated that he might or might not need surgery at some point to repair the hernia, that he attended speech therapy two or three times a week, and that his LPC

23

saw him weekly at home. Foster Mom also testified that she was committed to taking care of D.D.'s medical and therapeutic needs.

While Mother argues that no evidence showed that she could not or would not follow through with D.D.'s therapy or that she had not provided for his physical needs when she had possession of him, both parents recognized at trial that D.D. could not be returned to either one of them when the trial ended if the jury did not terminate. Father was confined in prison on a four-year sentence, and Mother claimed that she was moving to Abilene but had not yet secured a job or a place to live in Abilene. Mother indicated that she did not really have a plan if D.D. was returned to her because TDFPS had convinced her that there was no hope for his return. She answered that she understood that TDFPS was concerned that she did not have a plan and stated that "if anything [she] could go down there, stay with a family member until [she was] able to find a house and a job. It's hard to fill out applications and attend interviews [from] two hours away."

Further, neither parent had established a lifestyle that would insulate D.D. from danger and instability. Father testified that

- He would probably still be selling drugs if he were not confined; and

- While he would not give D.D. a "crack set" like his father had given him, he would sell drugs to support D.D. if necessary.

Father also tested positive for marihuana in February and May 2017.

Mother's drug issues were likewise still present. While she had some periods free of drug use during TDFPS's involvement, D.D. was removed in part

24

because of her intentional overdose. Mother's testing positive for methamphetamine and cocaine in April 2017 contributed to his second removal from her, and she tested positive less than three weeks before trial for methamphetamine, amphetamines, and marihuana.

Mother's testimony also indicated that she lacked judgment where family, friends, and lovers were concerned and did not put D.D.'s safety first. Mother testified that she did not care about Father's CPS history before their involvement because it was "before her" and stated that it never became important to her to know about Father's history. While she testified that it was important to her to keep D.D. away from drugs, she did not inquire about Father's drug history before getting pregnant with D.D. and then invited Father to live with D.D. and her after Father's release from prison on drug charges.

Also, on the trip to Abilene culminating in the second removal of D.D., Mother and D.D. rode with C.I., her brother whom she testified she had "never really had anything to do with" and who:

- had been staying at Grandparents' house and reported that he would test positive for amphetamines at the beginning of the TDFPS investigation;

- had hit or tried to hit Mother in early July 2016; and

- had "grown up pretty much taking off of [her] dad's lifestyle[—t]he drugs, the abusement, that type of lifestyle[,]" according to Mother.

Additionally, Mother testified that she knew before the second removal that she should get TDFPS to check people's backgrounds before leaving D.D. with them unsupervised. She admitted at trial, however, that she had never asked about

the "history" of the friend she left D.D. with in Abilene and that she did not know that her friend used drugs other than marihuana. Finally, at trial, Mother was pregnant with the child of a man she had known for a year and a half, but she could not answer definitively on the first day of trial whether he used drugs.

### d. TDFPS, D.D.'s LPC, and Foster Mom All Believed Termination Was in D.D.'s Best Interest.

If D.D. could not be returned to them, Mother and Father wanted him placed with a family member if possible, but at trial, none of the family members whose names they had provided to TDFPS had been approved; home studies were ongoing. Alternatively, Mother and Father wanted the jury to choose not to terminate their rights and leave D.D. in the managing conservatorship of the State of Texas. Evidence showed, however, that that decision would have left D.D. with more uncertainty and instability because he could be moved around from foster home to foster home until he aged out of the system without having "a chance to heal" or "the safety of a forever family."

TDFPS believed that termination of the parental rights and adoption would give D.D. permanency and stability and would be in his best interest. His LPC opined that termination of the parental rights and adoption by Foster Mom would be in D.D.'s best interest. Foster Mom indicated that she would want to adopt D.D. if the parents' rights were terminated and TDFPS approved and that that would be in his best interest. Foster Mom testified that she was committed to raising D.D. into adulthood and would support his dreams. She testified that she

26

already loved him as if he were her own.  Additionally, Foster Mom indicated that she was open to D.D. maintaining contact with members of his birth family including Mother and Father "[i]f they were healthy for him" but that she would put his interest first in making that decision.

### e. Father's and Mother's Excuses Do Not Militate Against Termination.

Father contends:

> if the factfinder had reviewed all the excuses that [Father] and [Caseworker Perez] had provided[,] the Trial Court could not have found termination was in the best interest of the child because . . . Father was not given every opportunity to succeed throughout the case.

The excuses Father relies on for his acts and omissions include:

- His belief that the TDFPS process is confusing;

- His testimony that TDFPS did not help him;

- The lack of guidance on the service plan;

- The six-month delay in getting a courtesy caseworker;

- Difficulty in finding providers;

- His not understanding the effects his plea bargain would have;

- The delay in getting appointed counsel in the termination trial;

- Limitations of incarceration;

- His ignorance of Mother's mental-health issues and violence;

- His belief that Mother was no danger to D.D. unless she and Father were a couple; and

- His having a plan for D.D. after his potential parole.

While these excuses, if valid, could possibly have had bearing on Father's failure to complete his court-ordered services and his willingness to leave D.D. in

27

Mother's care after the monitored return, these excuses do nothing to justify Father's continued drug use, criminal behavior, absence from D.D.'s life, and incarceration that support the finding that termination of Father's parental rights is in D.D.'s best interest.

Similarly, Mother points to these excuses:

- A rough childhood with at least one parent incarcerated at any given time;

- Violence from Father; and

- Depression and hopelessness.

However, Mother had overcome those hurdles enough to earn a monitored return of D.D. before more of her bad choices triggered his second removal. Like Father's excuses, Mother's excuses do nothing to mitigate the danger and instability her actions created for D.D., and they do nothing to suggest that termination is not in D.D.'s best interest.

### f. The Factfinder Could Reasonably Conclude That Termination of Mother's and Father's Parental Rights Served D.D.'s Best Interest.

Having performed an "exacting" review of the entire record while showing due deference to the factfinder, we hold that the evidence is factually sufficient to support the best-interest finding against each parent. We overrule Father's first issue and Mother's fifth issue.

28

**B.    The Trial Court Did Not Abuse Its Discretion by Admitting the Video over Mother's Rule 403 Objection.**

In her fourth issue, Mother contends that the trial court abused its discretion by admitting the video recorded by Abilene police on April 8, 2017, the day of D.D.'s second removal, arguing that the video was more prejudicial than probative under rule of evidence 403.

**1.    We Review the Trial Court's Decision to Admit the Video for an Abuse of Discretion.**

We review a trial court's admission of challenged evidence for an abuse of discretion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015); *J.P.B.*, 180 S.W.3d at 575. A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). We must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

**2.    A Trial Court Abuses Its Discretion by Admitting Relevant Evidence if Its Probative Value Is Substantially Outweighed by the Risk of Unfair Prejudice.**

Relevant evidence tends "to make a fact more or less probable than it would be without the evidence." Tex. R. Evid. 401(a). To prove that a parent's rights should be terminated, TDFPS must prove both a subsection (1) (or "conduct") ground and that termination is in the child's best interest. *See* Tex.

29

Fam. Code Ann. § 161.001(b)(1), (2). Therefore, any evidence making it more or less likely that Mother endangered D.D.'s physical or emotional well-being or failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain his return or that impacts the best-interest determination is relevant.[2]  *See id.* § 161.001(b)(1)(D), (E), (O), (2); *Murray v. Tex. Dep't of Fam. & Protective Servs.*, 294 S.W.3d 360, 368 (Tex. App.—Austin 2009, no pet.); *In re J.R.*, No. 02-15-00394-CV, 2016 WL 1267937, at *6 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.).

Relevant evidence should be excluded, however, if its probative value is substantially outweighed by the risk of unfair prejudice.  *See* Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and presumes that relevant evidence will be more probative than prejudicial.  *Murray*, 294 S.W.3d at 368. Excluding evidence under rule 403 is an extraordinary remedy that must be done sparingly.  *Id.*

### 3.    Cumulative Evidence is Harmless.

Mother argues:

- TDFPS did not need the entire video;

- The video contains images and voices of people other than Mother;

---

[2]We recognize that the evidence would also be relevant if it impacted the allegations against Father.

30

- "The majority of the . . . video demonstrates that the man with whom [Mother] was riding[] was in possession of illegal drugs and was driving a stolen vehicle"; and

- The video "'had the potential to impress the jury in some irrational, but nevertheless indelible way.'"

In developing her "irrational impression" argument, Mother focuses on the fact that the video is largely related to the man she was with—his actions, his statements, his crimes, his image, and his alleged cheating on his wife with Mother. She also points out that "[i]ndependent of the police body camera video, a police officer on the scene during the incident offered testimony regarding the activity on the crime scene in Abilene in April of 2017" and that admitting the entire video was therefore unnecessary. That contention, however, also decisively undercuts the bulk of Mother's complaint. If evidence erroneously admitted is merely cumulative of properly admitted evidence, then the error is harmless. *See State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 881 (Tex. 2008) (quoting *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989) ("The erroneous admission of testimony that is merely cumulative of properly admitted testimony is harmless error.")); *Mason v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-11-00205-CV, 2012 WL 1810620, at *15 (Tex. App.— Austin May 17, 2012, no pet.) (mem. op.). Our review of the record confirms that City of Abilene Officer New summarized the events depicted on the video. Thus, to the extent the video is cumulative of Officer New's testimony, error, if any, in its admission is harmless. *See* Tex. R. App. 44.1(a).

31

**4.    Evidence That Mother Was in an Illicit Relationship with the Man in the Video Is Also Harmless.**

Evidence that is on the video, mentioned by Mother in her brief, and not apparent elsewhere in the record is the evidence that Mother and the man arrested on the video were intimately involved even though he was married. Mother does not and cannot show, however, that such evidence, even if improperly admitted, solely determined her fate at trial. She therefore cannot show harm. *See* Tex. R. App. P. 44.1(a). We overrule Mother's fourth issue.

## III.    CONCLUSION

Having overruled Father's first and third issues and Mother's third, fourth, and fifth issues, all of which are dispositive, we affirm the trial court's judgment terminating Father's and Mother's parental rights to D.D.


                                                    PER CURIAM

PANEL:  PITTMAN, J.; SUDDERTH, C.J.; and BIRDWELL, J.

DELIVERED:  April 5, 2018